Filed 1/3/25  P. v. Barraza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDREW NEHEMIAH BARRAZA,<br><br>Defendant and Appellant. | F086657<br><br>(Super. Ct. No. BF180557A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Shortly after midnight, on March 11, 2020, Andrew Nehemiah Barraza (appellant) shot and killed Javier Rodriguez, Jr. in the street next to a gas station. A jury convicted appellant of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1)[1] with an enhancement for intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2). The jury was unable to reach a verdict as to the lying-in-wait special circumstance allegation. (§ 190.2, subd. (a)(15).) In a bifurcated proceeding, the trial court found appellant suffered a prior strike conviction. (§ 1170.12, subds. (a)–(d).) The trial court sentenced appellant to an indeterminate term of 75 years to life in state prison.

On appeal, appellant claims the trial court committed prejudicial error in allowing the People to admit gang evidence to prove motive and rebut appellant's testimony that he acted in self-defense. We conclude that any presumed error in admitting the gang evidence was harmless. We also reject appellant's claim that the evidence was insufficient to sustain the jury's finding that the murder was deliberate and premeditated. We affirm.

## BACKGROUND

### I.     Rodriguez is Found Dead in the Street with Gunshot Wounds.

On March 11, 2020, just after midnight, officers responded to a gas station at the intersection of Brundage Lane and H Street in Bakersfield to a report of a person down in the roadway. There, an officer found Rodriguez lying unresponsive in the middle of H Street with an apparent gunshot wound to the chest. Officers located three expended cartridge casings in the street near Rodriguez's body. Rodriguez was lying face up, and a

---

[1]     All further statutory references are to the penal code unless otherwise indicated.

bullet was found underneath his back.  Another bullet was found in the parking lot of the gas station.  No weapons were located on Rodriguez's body.

An autopsy revealed Rodriguez suffered a gunshot wound to the chest with a corresponding exit wound to the back.  A bullet was discovered lodged inside of Rodriguez's body.

## II.    Gas Station Surveillance Video Shows Appellant Shoot Rodriguez.

Law enforcement obtained surveillance video from the gas station surveillance system, which included numerous cameras positioned inside and around the gas station.  The recordings were admitted into evidence and played for the jury.

The surveillance videos show Rodriguez approach the gas station on foot at about 11:58 p.m.  As Rodriguez walks toward the gas station market, a black sedan pulls up next to the market.  Appellant and his girlfriend, Jeanette Cardenas, exit through the rear driver's side door.  Cardenas's adult son, Roman, is in the front passenger's seat, and Roman's girlfriend, Jasmine, is driving.

Rodriguez, appellant, and Cardenas approach the door of the market at the same time.  Appellant opens the door for Cardenas, then holds the door open for Rodriguez as they all enter the market.  Once inside, Cardenas walks ahead of the men toward the beverage refrigerators near the back of the market.  As Cardenas proceeds down an aisle, Rodriguez tilts his head and leans to the left to look at her.  Appellant, who was standing behind Cardenas, can be heard asking Rodriguez, "You like that, dog?"  Rodriguez responds, "Hell, yeah!"

The two men continue walking toward the back of the market, and appellant states, "That's my wife, dog."  Appellant and Rodriguez briefly converse while standing near the beverage refrigerators, but their statements are unintelligible on the video recording.  Cardenas says, "Alright, lets [*sic*] see, come here," and puts her hand on appellant's back.  Appellant turns his back to Rodriguez and faces Cardenas, and she points to items inside one of the refrigerators.  Rodriguez stands behind appellant for

3.

several seconds, then can be heard saying, "Sorry 'bout that," and "I'm apologizing to her." Appellant and Cardenas remain facing away from Rodriguez and do not appear to respond. A few seconds later, Rodriguez walks away and exits the market without buying anything. Appellant turns his head and watches Rodriguez as he leaves.

After exiting the market, Rodriguez walks around the gas station parking lot then stops near the outside corner of the market. Appellant remains in the market for about 20 seconds, hands cash to Cardenas, then exits. Cardenas remains in the market and purchases a pack of beer.

Once outside, appellant walks to the corner of the building and approaches Rodriguez with his hands on his waistband. The two begin speaking, but there is no audio recording for the exterior surveillance cameras, so it is unknown what is being said. After about 40 seconds, appellant takes several steps backward, then appears to gesture to Rodriguez to follow him. They walk across the parking lot, remaining several feet apart, with appellant in the lead. Appellant keeps his hands on his waistband.

As appellant and Rodriguez walk toward the street, the black sedan pulls near them and stops. Roman, who had gone into the market after appellant and Cardenas, exits the market and stands by the sedan. He watches appellant and Rodriguez interact until Cardenas exits the market and approaches the sedan, and they both get inside.

When appellant and Rodriguez reach the edge of the parking lot, appellant smiles, then appears to gesture with his head toward the street. Appellant then turns his back to Rodriguez, and they continue walking. Appellant stops before reaching the sidewalk, faces Rodriguez, and gestures again toward the street. Rodriguez walks into the street, and appellant follows.

Once they reach the middle of H Street, appellant and Rodriguez continue to converse, and they intermittently lean forward toward each other and assume what appear to be fighting stances. At one point, a grey car traveling southbound on H Street stops, and appellant steps out of the street and motions for the car to drive past them. Appellant

4.

then turns to the black sedan and appears to wave for it to exit the parking lot. He continues to step backward as Rodriguez slowly steps toward him. They remain several feet apart, and appellant keeps his right hand on his waistband. As the sedan begins to turn onto H Street, appellant turns toward the sedan, keeping the right side of his body closest to Rodriguez. Just after the sedan completes its turn, appellant appears to shoot Rodriguez and immediately begins sprinting in the direction of the sedan. Rodriguez collapses to the ground, and a puff of smoke appears on the street several feet behind him. Appellant continues sprinting toward the sedan, and runs out of the view of the surveillance cameras at approximately 12:02 a.m.

## III.     Subsequent Investigation and Arrest.

The day after the shooting, law enforcement contacted Cardenas during a traffic stop and seized her cell phone. An officer conducted a forensic examination of the cell phone's data and discovered two "Snapchat" videos. One video shows Cardenas and appellant sitting together at a restaurant. The other video depicts appellant and contains the following text:

> "Yes I just got done smacking. She is mine. If you even think of her, those will be your last thoughts."

The officer explained that "smacking" is "a common colloquialism or reference to sex." The officer confirmed that he did not know how the videos ended up on the phone, or whether the videos had been posted on social media.

On March 29, 2020, law enforcement responded to a burglar alarm at a residence near the city of Taft, approximately 30 minutes outside of Bakersfield. Inside, officers encountered appellant, who identified himself with a false name and claimed he was there to fix up the residence. Appellant was arrested.

## IV.     Defense Evidence and Appellant's Testimony.

The defense called a witness who was working at a liquor store on the opposite side of Brundage Lane at the time of the shooting. The witness testified he was walking

to his car when he heard male voices arguing and shouting. He could not make out what was being said. After the males went into the street, he heard a gunshot. One of the males fell, and the other male ran away.

Appellant testified that on the night of March 10, 2020, he went out to dinner with Cardenas, who he had been dating since 2018. He intended to marry Cardenas and saw her as his wife. At the restaurant, he consumed nine tequila shots, two margaritas, and other mixed drinks. He also admitted he smoked and snorted methamphetamine that evening. They took a taxi home from the restaurant around 10:00 p.m.

Later that night, Cardenas told appellant they were out of toilet paper and needed to get more immediately due to the shortage caused by the COVID-19 pandemic. Because they had been drinking, Jasmine volunteered to drive, and they went to a drug store to buy toilet paper. Appellant brought his loaded nine-millimeter handgun in his waistband. On the way home, appellant asked to stop at the store to buy beer, and they stopped at the gas station on Brundage Lane and H Street.

Appellant identified himself in the surveillance video. He testified he did not know Rodriguez. Appellant claimed that as they entered the market, appellant looked at Cardenas and said, "[D]amn." Once inside, he saw Rodriguez lean his head to look at Cardenas and say "damn" while making a gesture as though he was "getting something delicious." Appellant asked Rodriguez if he "like[s] that," and Rodriguez responded, "[H]ell, yeah." This upset appellant.

Appellant testified that when they reached the back of the store, Rodriguez approached them and tried to apologize, but he thought Rodriguez was trying to get past him and close to Cardenas. This made appellant feel threatened and even more upset. Based on his appearance, he thought Rodriguez might be a gang member. He testified this raised his concern that Rodriguez was carrying a weapon under his clothing and might do something violent.

6.

When appellant exited the market, he saw Rodriguez near the corner of the building and thought he might have been waiting for him. Appellant testified he felt emotional and enraged and was also very intoxicated. He approached Rodriguez and asked him, "[W]hat the fuck was your problem." They started to argue, and according to appellant, Rodriguez told him, "I'll fucking smoke you and take your bitch." Appellant testified he viewed this comment as a threat to shoot him, and believed Rodriguez had a firearm because he kept his hands near his waistband.

As appellant and Rodriguez walked across the parking lot, they continued "talking shit to each other." Appellant denied attempting to lure Rodriguez into the street, and claimed Rodriguez gestured that they move to the street. Appellant claimed he did not go back to the sedan because he was afraid Rodriguez would shoot toward him and strike someone in the sedan. Once they reached the street, they continued to talk back and forth. They squared up to fight, but appellant was hesitant to do so because he was scared that Rodriguez had a firearm. Appellant reiterated that he was intoxicated and felt scared and "maybe overly enraged."

On cross examination, appellant was shown the portion of the video showing him waving to the grey car to pass by him and Rodriguez in the street. When asked to explain why he felt comfortable directing a passerby to leave even though he was scared for his life, appellant maintained he was not thinking clearly.

Appellant testified he motioned to the black sedan to leave because he wanted the occupants to get away in case Rodriguez drew a firearm. When the sedan turned onto H Street, he already had his hand on his firearm.

Appellant claimed that immediately before the shooting, he saw Rodriguez "clenching for his waist." In response, he pulled out his gun and fired three shots as he ran away. Appellant testified he did not intend to shoot Rodriguez and only wanted to scare him. He did not aim at Rodriguez or even look at him when he fired. He ran

7.

because he was scared Rodriguez was going to shoot him. He claimed that if he had known that Rodriguez was unarmed, he never would have drawn his firearm.

Appellant admitted he was an active member in the Colonia Bakers gang. He testified his moniker was "Green Eyes," and that he has several gang related tattoos. He denied that his gang membership had anything to do with the shooting. Specifically, he testified he did not shoot Rodriguez because of gang politics, or due to any gang rule requiring that he respond to disrespect.

## V.    Rebuttal Evidence.

The People's gang expert explained he was familiar with appellant through his work in the gang unit. He described one prior interaction with appellant during a traffic stop where appellant admitted he was a Colonia Bakers gang member. The gang expert also described appellant's gang related tattoos, including a tattoo of the letter "C" on his face.

Based on his training and experience, the gang expert opined that appellant was a "very influential" member of the Colonia Bakers gang. He explained that the Colonia Bakers gang is a Sureño gang, and Sureño gangs are "foot soldiers" for the Mexican Mafia prison gang. Most Hispanic gangs in Bakersfield are Sureño gangs, and they rival on the streets, but work together while incarcerated.

The gang expert reviewed the surveillance videos and observed that Rodriguez was wearing a blue handkerchief around his neck on the night of the shooting. He found this significant because blue is the primary color of Sureño gangs, and Sureño gang members will often wear a blue handkerchief to show their affiliation. Based on Rodriguez's clothing, he believed Rodriguez might be a Sureño gang member, but he had no knowledge of whether Rodriguez was gang affiliated. The gang expert also noted that the shooting occurred in West Side Bakers gang territory.

The gang expert described the importance of respect within gang culture. He explained that gang members gain respect by committing crimes that benefit the gang,

instilling fear in the community, or guiding younger gang members. Gang members will react to acts of disrespect in different ways but will often respond with violence.

Based on a hypothetical question, the gang expert opined that if an influential member of the Colonia Bakers gang went into West Side Bakers territory and encountered a person who appeared to be a Sureño gang member, and the Sureño gang member insulted him, he would expect the influential gang member to "do something about it, whether it be an assault, a stabbing, a shooting, or a homicide." He explained that in the culture of Sureño gangs, gang members are expected to retaliate because they "operate off of respect." This is particularly true for influential gang members because they will lose respect from subordinates if they do not respond to acts of disrespect.

## DISCUSSION

### I.    The Admission of Gang Evidence at Trial Was Harmless.

In response to appellant's testimony that he acted in self-defense, the trial court granted the People's request to admit evidence that appellant was a high-ranking member of the Colonia Bakers gang, and that within gang culture, high-ranking members must respond to acts of disrespect. Although no gang allegations were charged, the trial court ruled that the gang evidence was admissible and relevant to show that appellant acted with a gang motive, rather than out of fear.

Appellant contends the admission of gang evidence was prejudicial error. He argues the gang evidence was not properly admitted, or that it should have been excluded under Evidence Code section 352. With respect to prejudice, he argues the People's gang expert's testimony that gang members are expected to respond to acts of disrespect, combined with the prosecutor's reliance on that testimony during closing argument to assert that the killing was motivated by appellant's status in the gang, created the danger that the jury improperly inferred appellant was predisposed to violence, and convicted him solely because he was a gang member. Appellant also highlights aspects of the gang evidence that he claims were particularly inflammatory, such as the gang expert's

9.

testimony that gang members gain respect by committing crimes and instilling fear in the community, and that the Colonia Bakers are foot soldiers for the Mexican Mafia prison gang. He argues that if gang evidence had not been admitted it is reasonably probable the jury would have harbored a reasonable doubt as to whether appellant acted in self-defense or in the heat of passion.

We need not determine whether the trial court properly admitted the gang evidence because any presumed error was harmless. The surveillance videos admitted at trial overwhelmingly established appellant was guilty of first degree murder, and conclusively undermined his claims that he acted in self-defense or in the heat of passion. Given the compelling evidence of guilt, independent of the gang evidence, we conclude beyond a reasonable doubt that the purported error did not contribute to the verdict.

### A. *Background.*

Appellant's charges did not include gang enhancements or allegations. The People initially alleged, as to the murder charge, gang-murder special circumstances (§ 190.2, subd. (a)(22)) and a gang enhancement (§ 186.22, subd. (b)(1)), but these allegations were discharged at the preliminary hearing.

Appellant moved in limine to exclude evidence of his gang status pursuant to Evidence Code section 352. The prosecutor did not object, but noted the only prosecution witnesses who could identify appellant in the surveillance videos were law enforcement officers. The prosecutor clarified he was not seeking to elicit gang evidence, but requested the officers be allowed to testify they are familiar with appellant and explain how they were able to recognize him in the surveillance videos. Defense counsel objected, arguing that identity was not at issue, and the surveillance videos were clear enough for a layperson to identify appellant. The trial court ruled it would allow the identifying officers to testify they had contacted appellant in the past, were familiar with him, and were able to identify him in the surveillance videos, but it excluded references to gangs and appellant's tattoos under Evidence Code section 352. After the court issued

10.

its ruling, the parties agreed to stipulate that appellant is the person depicted in the surveillance videos.

Prior to the defense case in chief, the trial court held a hearing on the scope of permissible impeachment evidence if appellant chose to testify. The prosecutor argued that if appellant testified that he acted in self-defense, the People should be allowed to admit gang evidence to show he acted with a gang motive rather than out of subjective fear. According to the prosecutor, appellant was a high-ranking member in the Colonia Bakers gang, and Rodriguez was wearing clothing suggesting he might also be a gang member. The prosecutor claimed that within gang culture, superiors must be given respect, and if a high-ranking gang member is disrespected, he must respond to the disrespect. To challenge a claim of self-defense by appellant, the prosecutor requested he be allowed to cross-examine appellant on whether the shooting was gang motivated, then call a gang expert in rebuttal to explain how gang culture played into appellant's subjective intent. Defense counsel objected, arguing there was no evidence appellant knew Rodriguez or that the shooting was gang motivated, and that the admission of gang evidence would be highly prejudicial.

The trial court ruled it would allow the People to admit gang evidence if appellant testified that he acted in self-defense, reasoning such evidence would be relevant to show appellant acted with a gang motive rather than out of fear. Recognizing the potential for prejudice, the trial court limited the gang evidence under Evidence Code section 352 to a brief explanation of the Colonia Bakers gang, the opinion that appellant belonged to the gang, an explanation of why Rodriguez's appearance would suggest he was gang affiliated, and expert testimony regarding the respect and disrespect in gang culture. The court excluded evidence of prior gang crimes appellant or others may have committed. The court also ruled that appellant's status in the gang as a high-ranking member was relevant to his motive to respond to an act of disrespect. However, the court prohibited

11.

the expert from explaining the basis for his opinion that appellant was a high-ranking member of the gang.

## B.     *Standard of review.*

The erroneous admission of evidence is state law error and ordinarily subject to the prejudice standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Marks* (2003) 31 Cal.4th 197, 226–227; see *People v. Champion* (1995) 9 Cal.4th 879, 923 [failure to exclude gang evidence evaluated under *Watson* standard], disapproved on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.)  Under *Watson*, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred.  (*Watson, supra,* p. 836.)

Appellant argues, however, that the admission of gang evidence rendered his trial fundamentally unfair in violation of his right to due process.  He contends the alleged error is subject to the more stringent standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which applies to errors of a constitutional dimension.  Under *Chapman,* reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict.  (*Ibid*.)

## C.     *Any presumed error was harmless.*

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the alleged error was harmless under either standard.  The evidence of appellant's guilt was overwhelming.  We have reviewed the surveillance videos admitted at trial in detail, and they conclusively establish appellant acted with deliberation and premeditation.  Appellant followed Rodriguez out of the gas station market and confronted him while carrying a loaded firearm concealed in his waistband. The surveillance videos show appellant lead Rodriguez across the parking lot and into the street.  As the prosecutor argued, this took the victim out of the view of potential witnesses.  Once in the street, appellant waved to the driver of the black sedan.  Just as

the car exited onto the street, appellant drew his firearm from his waistband and fired three shots, striking the victim in the chest. Moreover, as appellant fired the fatal shots, he sprinted off camera in the direction of the black sedan. In short, appellant initiated a confrontation with Rodriguez outside of the gas station market, lured Rodriguez into the street with the intention of killing him and timed the shooting with the departure of his getaway car.

Appellant argues that if the gang evidence had been excluded, the jury may have found there was reasonable doubt as to whether he acted in perfect or imperfect self-defense. But self-defense, whether perfect or imperfect, requires the defendant actually believe in the need to defend against imminent harm. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *In re Christian S*. (1994) 7 Cal.4th 768, 783.) The surveillance videos conclusively refute appellant's testimony that he harbored such belief. Despite his testimony that he believed Rodriguez was armed with a firearm and that he feared for his life, appellant confronted Rodriguez outside of the gas station market. Even after Rodriguez allegedly threatened to "smoke" him, appellant repeatedly turned his back to Rodriguez as they walked across the parking lot, and he stopped at one point to wave to a passing car to go around them. Appellant made no effort to seek help, flee, or use some lesser degree of force, such as drawing his firearm and telling Rodriguez to leave. Instead, he waited until Rodriguez was in the street to draw his concealed firearm and fire multiple shots. In the seconds prior to the shooting, Rodriguez did not do anything that could have been reasonably perceived as an act of aggression. Rodriguez did not have a weapon, his arms were at his sides, and he did not make any sudden movements.[2] Moreover, the Snapchat video of appellant with text threatening to end the life of anyone

---

[2] Appellant asserts the surveillance videos show Rodriguez "lunged forward as the shots were fired." This is inconsistent with our review of the surveillance videos, which show Rodriguez fell toward appellant after being shot.

who "even think[s]" about Cardenas shows the killing was motivated by retaliation rather than fear, further undermining his assertion that he acted in self-defense.

We also reject appellant's claim that in the absence of the gang evidence the jury may have convicted him of heat of passion voluntary manslaughter instead of murder. Heat of passion requires "sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) The surveillance videos amply demonstrate the shooting was not an "unconsidered reaction." (*Ibid.*) Appellant did not attack Rodriguez inside of the market after Rodriguez admitted to looking at Cardenas. He also did not attack Rodriguez after he exited the market and Rodriguez purportedly stated he would "smoke" him and take Cardenas. Instead, appellant kept his firearm concealed and led Rodriguez across the parking lot and into the street. Without warning, he drew his firearm and fired multiple shots from close range as he fled in the direction of his getaway vehicle. Thus, contrary to appellant's claim, the surveillance videos conclusively show the shooting was a deliberate and calculated attack rather than a rash response to provocation.

We recognize that evidence of gang membership and prior criminal acts inherently carries some risk that a jury will improperly infer that a defendant has a propensity to commit criminal offenses. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; *People v. Williams* (1997) 16 Cal.4th 153, 193.) However, this risk was substantially mitigated by the trial court's limiting instruction not to consider the gang evidence for any improper purpose. Specifically, the jury was instructed that it may not conclude from the gang evidence that appellant "is a person of bad character or that he has a disposition to commit crime." (See CALCRIM No. 1403.) We presume the jury followed this instruction. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption"].)

We also observe that the jury deliberated for more than three days, made multiple requests for readback of appellant's testimony, and was unable to reach a verdict on the lying-in-wait special-circumstance allegation.  This demonstrates the jury did not simply disregard appellant's testimony and convict him of all charges and allegations because he was a gang member.  (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131–1132 ["It is apparent from this record the jury did not simply rely on the gang evidence to convict the defendants of the charged crimes"], disapproved on another ground by *People v. Burgos* (2024) 16 Cal.5th 1, 31.)  Rather, it appears the jury thoroughly deliberated and carefully examined the evidence supporting each allegation, regardless of the admission of gang evidence.

Considering the overwhelming evidence of guilt independent of the gang evidence, the use of a limiting instruction, and the jury's extensive deliberations, the guilty verdict rendered in this trial was surely unattributable to the purported error.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)  The evidence conclusively established appellant led Rodriguez into the street to shoot him.  And as the surveillance videos made clear, appellant's conduct was wholly inconsistent with a person who feared for his life or acted under the heat of passion.  Accordingly, we conclude beyond a reasonable doubt that the admission of gang evidence did not contribute to the verdict, and this claim lacks merit.  (See *Chapman, supra,* 386 U.S. at p. 24.)  Likewise, it is not reasonably probable that the verdicts would have been more favorable to appellant absent this purported error.  (*Watson, supra,* 46 Cal.2d at p. 836.)  Any presumed error was harmless.

## II.     The First Degree Murder Conviction Was Supported by Substantial Evidence.

The jury convicted appellant of first degree murder based on its finding that the murder was willful, deliberate, and premeditated.  Appellant contends the jury's finding of deliberation and premeditation was not supported by sufficient evidence.  Based on our review of the record, we conclude the evidence was sufficient to sustain the verdict.

### A.    Standard of review.

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt."  (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)  We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)  "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' "  (*People v. Tripp*, *supra*, at p. 955, italics omitted.)

### III.    The Evidence Was Sufficient to Sustain the Jury's Finding of Deliberation and Premeditation.

A murder that is perpetrated by a "willful, deliberate, and premeditated killing" is classified as murder of the first degree.  (§ 189, subd. (a).)  " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance."  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  " 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.…" [Citations.]' "  (*Ibid.*)  "[A] killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse."  (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)

As we explained above, the evidence that appellant acted with premeditation and deliberation was overwhelming.  Although there was no evidence appellant and Rodriguez knew each other prior to meeting at the gas station market, their interactions lasted several minutes, giving appellant ample opportunity to reflect on his decision to kill.  Instead of shooting Rodriguez inside of the market after Rodriguez made comments

16.

about Cardenas, or in the gas station parking lot immediately after he confronted Rodriguez, appellant gestured to Rodriguez to follow him into the street, then abruptly drew his firearm and shot Rodriguez multiple times. The surveillance videos show that Rodriguez did not make any sudden or aggressive movements before the shooting. Additionally, just prior to the shooting, appellant waved to his getaway car to exit the parking lot and waited until it turned onto the street before firing the fatal shots. This evidence made clear that appellant executed a plan to lure Rodriguez into the street to ambush him with a concealed firearm. Accordingly, the evidence was more than sufficient to sustain the jury's finding that appellant's conduct was premeditated and deliberate, and this claim lacks merit.

## DISPOSITION

The judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


PEÑA, J.


SNAUFFER, J.

17.